NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| ANTHONY ARAUJO, | : | |
| | : | **Civil Action No. 10-3985 (SRC)** |
| Plaintiff, | : | |
| | : | **OPINION** |
| v. | : | |
| | : | |
| NEW JERSEY TRANSIT RAIL | : | |
| OPERATIONS, INC., | : | |
| | : | |
| Defendant. | : | |
| | : | |

**CHESLER**, District Judge

        This matter comes before the Court upon Defendant's motion for summary judgment

[docket entry 38].  Plaintiff has opposed the motion.  This Court has considered the submissions

by the parties in connection with these motions and has opted to rule without oral argument

pursuant to Federal Rule of Civil Procedure 78.  For the reasons discussed below, this Court

grants Defendant's motion.


I.    FACTS

        This is an action for unlawful retaliation under the Federal Rail Safety Act ("FRSA"), 49

U.S.C. § 20101, et seq.  It arises out of a fatal accident involving a construction crew hired by

Defendant New Jersey Transit Rail Operations, Inc. ("Defendant" or "NJT") to perform

maintenance work on bridges that pass over electrified railroad tracks operated by NJT.  One

member of the crew, Anthony Clemente, came into contact with live overhead wire (or

"catenary"), suffered severe burns and ultimately perished from those injuries.  Plaintiff Anthony

Araujo ("Plaintiff" or "Araujo"), an NJT employee overseeing the crew, claims that disciplinary

action taken against him by NJT was done in retaliation for his reporting of Clemente' injury as

well as his own injury from the incident.  The relevant facts are as follows:

On February 25, 2008, the Beaver Construction Company ("Beaver Construction") was

working in an ongoing NJT project of overhead bridge rehabilitation on a section of Track 2 in

Newark, New Jersey.  The Beaver Construction workers used a high rail truck with a power-

operated lift that allowed them to gain access to the underside of the bridge structures to perform

their work. Plaintiff Araujo was assigned to serve as the conductor–flagman.  In that capacity,

Araujo's primary responsibility was to protect the construction crew members from the

movement of trains in the course of using the high rail vehicle.

On that day, two Class A linemen employed by NJT, Jeff Meisner and Christopher

Picton, were assigned to de-energize the catenary and provide protection to the contractor crew

from the overhead wires.  The linemen told the Beaver Construction superintendent, Nicolas

Gilman, that the crew was supposed to work only at the Third Street area of Track 2.  They did

not brief Araujo regarding the limits of the catenary outage for that day.  Araujo admits he did

not communicate with either the linemen or the contractor's superintendent regarding the extent

of the catenary outage.

Rather, based on his experience and what he claims was the usual past practice of NJT,

Araujo assumed the catenary was de-energized to the same extent as the track outages.  The track

outage information is set forth in a document known as a Bulletin Order.  The Bulletin Order

Araujo had received for the date of the incident noted that Track 2 was out of service for

2

electrical trains between Broad Street and Roseville Avenue, an area which included Seventh Avenue, where the accident occurred.  The catenary de-energization, controlled by a form known as an E.T. 102, did not, however, extend that far.  Araujo, in fact, has admitted that he did not know the extent of the catenary outage.

The Beaver Construction crew, accompanied by Araujo, commenced their work at the Third Street area of Track 2.  After the crew completed their work on the Third Street Bridge, Araujo believed they were going to get off the tracks at the Bathgate Avenue exit ramp, which is just past Seventh Avenue.  Picton and Meisner, the Class A linemen, did not remain present with the construction crew but rather moved on to meet the contractors at the Bathgate ramp.   Instead of exiting, and without receiving the approval of the Class A linemen, the contractor crew's foreman, Francis McNeil, requested that the crew stop at the Seventh Avenue bridge to perform minor repairs.  Araujo states that he was with McNeil when McNeil communicated with Gilman over a two-way radio and heard their conversation.  According to Araujo, Gilman told McNeil that "he had the catenary" and that he had signed off on the catenary outage with the linemen. Araujo understood this information to mean that the catenary was de-energized at Seventh Avenue. He has explained that the communication was consistent with his experience, in which, in practice, linemen communicated catenary outages to a conductor-flagman by relaying the information through a construction crew foreman.

Neither the crew nor Araujo were aware that they were beyond the catenary outage at the Seventh Avenue area of Track 2.  When the crew began their work there, Araujo walked away from the crew to lock the Bathgate access gate, as they would not be exiting through that ramp. At or around that time, the crew raised the vehicle lift towards the Seventh Avenue bridge.

3

When Araujo was some distance from the crew, the live catenary electrocuted Clemente.  Araujo called 911 for medical assistance.  He also called his dispatcher to report the situation.

Both NJT management and the Federal Rail Administration ("FRA") arrived at the scene to begin an investigation.  They interviewed many witnesses throughout the course of the day and into the late hours of February 25.  Araujo points out that after consultation with the FRA inspectors, his supervisor, NJT Superintendent Joseph Meade, decided not to order Araujo to submit to drug and alcohol testing pursuant to FRA regulations.   In contrast, Araujo further points out, the linemen were subjected to D&A testing based on the FRA standard for when reasonable cause exists to conduct such testing.

The preliminary investigation indicated that the Class A linemen on duty, Picton and Meisner, were primarily responsible for the incident.  They were subsequently charged with various violations of NJT rules.  Following a hearing and investigation procedure, Picton and Meisner were found guilty of the charges, and as a result they were fired by NJT.

The investigation also revealed that Araujo may have been partially responsible for the incident.  On or about March 5, 2008, NJT filed a Notice of Investigation against Araujo.  It charged him with violating Rules 13, 14, 15 and 101 of NJT's Electrical Operating Instructions, TRO-3, which are designed to prevent NJT's employees and contractors from coming into contact with NJT's live electrified wires.  Summarized broadly, the rules require conductors to prevent people under their protection, such as contractors, from going near the catenary unless the conductor knows that the catenary is de-energized.  Under Rule 13, all overhead wires must be considered energized at all times, except when it is known that they have been de-energized and grounded.  Rule 14 requires conductors to ensure that contractors know that they may not

4

work on or near energized wire and must abide by the clearance set forth in Rule 15. Rule 15 requires the NJT employee to maintain a clearance of 15 feet from a catenary for all contractors, unless the catenary is de-energized and grounded.  Rule 101 similarly obligates NJT employees to prevent all persons from going near wires until it is known that the catenary is de-energized.

The three-day hearing ultimately occurred in December 2008 and January 2009.  Araujo testified at the hearing, as did Meade.  Representatives of Araujo's labor union were also present. Araujo admitted that he relied on the communication between Gilman and McNeil regarding the catenary outage and did not confirm that information with the Class A linemen. Araujo also admitted that he had "no clue" as to the area in which the crew was authorized to work and no knowledge of the catenary status or limitations.  (Phelps Aff., Ex. A at 400-05.)  NJT General Superintendent Angel Soto, who presided over the hearing, concluded that the charges against Araujo had been substantiated.  On February 11, 2009, Soto assessed discipline against Araujo consisting of time held out of service.  Araujo and his union appealed the discipline internally, and NJT denied the appeal.  Thereafter, the union requested arbitration before the Special Board of Adjustment but later withdrew that request.

The parties recognize that Araujo also sought medical treatment as a result of the fatal electrocution accident.  On February 26, 2008, the day after the incident, but before Araujo was charged with any rules violations, Araujo sought counseling from NJT's medical department under its Employee Assistance Program ("EAP").  EAP provided Araujo with counseling and determined he was not medically qualified to return to work.  Araujo was placed out of service until October 2, 2008.  Pursuant to a waiver signed by Araujo, the EAP counselor who assessed Araujo called Meade on February 27, 2008 to inform him that Araujo was out of service.

Over the months of his medical leave, Araujo continued to receive counseling from EAP. Initially, NJT paid Araujo his full earnings during his EAP leave. Then, on May 22, 2008, NJT ceased paying him his salary, which NJT asserts is consistent with both NJT policy and the Federal Employers Liability Act ("FELA"), 45 U.S.C. § 51, et seq., the statute which governs compensation of railroad employees who are injured while employed by a rail carrier. Between May 22, 2008 and October 2, 2008, when Araujo was cleared by the EAP to return to work, Araujo received disability benefits pursuant to FELA. Pending the disciplinary hearing, which had been adjourned numerous times at the request of Araujo's labor union, Araujo continued to be held out of service after receiving medical clearance to resume working.

## II.   DISCUSSION

### A.   Summary Judgment Standard

The standard upon which a court must evaluate a summary judgment motion is well-established. Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Kreschollek v. S. Stevedoring Co., 223 F.3d 202, 204 (3d Cir. 2000). In deciding a motion for summary judgment, a court must construe all facts and inferences in the light most favorable to the nonmoving party. See Boyle v. County of Allegheny Pennsylvania, 139 F.3d 386, 393 (3d Cir. 1998). The moving party bears the burden of establishing that no genuine issue of material fact remains. See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). "[W]ith respect to an issue on which the nonmoving party bears the

6

burden of proof . . . the burden on the moving party may be discharged by 'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case." Celotex, 477 U.S. at 325.

Once the moving party has properly supported its showing of no triable issue of fact and of an entitlement to judgment as a matter of law, the non-moving party "must do more than simply show that there is some metaphysical doubt as to material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). The party opposing the motion for summary judgment cannot rest on mere allegations and instead must present actual evidence that creates a genuine issue as to a material fact for trial. Anderson, 477 U.S. at 248; see also Fed.R.Civ.P. 56(c) (setting forth types of evidence on which nonmoving party must rely to support its assertion that genuine issues of material fact exist). "[U]nsupported allegations . . . and pleadings are insufficient to repel summary judgment." Schoch v. First Fid. Bancorporation, 912 F.2d 654, 657 (3d Cir. 1990). "A nonmoving party has created a genuine issue of material fact if it has provided sufficient evidence to allow a jury to find in its favor at trial." Gleason v. Norwest Mortg., Inc., 243 F.3d 130, 138 (3d Cir. 2001). If the nonmoving party has failed "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial, . . . there can be 'no genuine issue of material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Katz v. Aetna Cas. & Sur. Co., 972 F.2d 53, 55 (3d Cir. 1992) (quoting Celotex, 477 U.S. at 322-23).

**B.     Analysis**

The sole cause of action pled in the Complaint arises under FRSA, a federal rail safety

statute that contains a whistleblower provision.  FRSA provides that a railroad carrier "may not

discharge, demote, suspend, reprimand or in any other way discriminate against an employee if

such discrimination is due, in whole or in part, to the employee's lawful, good faith act" in

connection with various enumerated activities furthering adherence to federal safety laws and

regulations. 49 U.S.C.  § 20109(a).   In relevant part, the statute prohibits retaliation against an

employee who "notif[ies], or attempt[s] to notify, the railroad carrier or the Secretary of

Transportation of a work-related personal injury or work-related illness of an employee.  49

U.S.C. § 20109(a)(4).  In other words, as summarized by an implementing regulation:

> FRSA provides for employee protection from retaliation because the
> employee has engaged in protected activity pertaining to railroad safety or
> security (or, in circumstances covered by the statutes, the employee is
> perceived to have engaged or to be about to engage in protected activity),
> has requested medical or first aid treatment, or has followed orders or a
> treatment plan of a treating physician.

29 C.F.R. § 1982.100(a).  FRSA authorizes an aggrieved employee to initiate a civil action after

exhausting administrative remedies through the Department of Labor.  49 U.S.C. § 20109(d)(3).[1]

Araujo claims that NJT initiated and pursued disciplinary charges against him in

retaliation for reporting Clemente's injury to the NJT dispatcher and to the police on February

---

[1] Araujo pleads in the Complaint that he has met the statutory prerequisites to file suit.
Defendant does not challenge the FRSA claim on this ground.

8

25, 2008 and for reporting his own injury to NJT's medical department on February 26, 2008.[2] NJT does not dispute that these activities are protected under FRSA.  Rather, it argues that summary judgment is warranted because, as a matter of law, Araujo cannot establish a causal link between the discipline imposed by NJT and his protected activity.

The parties have not presented any binding authority to the Court concerning how to evaluate the viability of a FRSA whistleblower claim, nor has the Court's own research uncovered any reported cases dealing with FRSA retaliation claims.  Defendants, however, have urged the Court to apply the analytical framework employed in cases involving employment discrimination or retaliation under other federal statutes, in particular Title VII of the Civil Rights Act. Fuentes v. Perskie, 32 F.3d 759, 763 (3d Cir. 1994); see also Carroll v. United States Dep't of Labor, 78 F.3d 352 (8th Cir. 1996) (applying Title VII burden-shifting framework to a whistleblower case under the Energy Reorganization Act); Parker v. Hahnemann Univ. Hosp., 234 F. Supp. 2d 478, 488 (D.N.J. 2002) (applying analysis used in employment discrimination cases brought under Title VII, Americans with Disabilities Act and Age Discrimination in Employment Act to an action for retaliation under the Family Medical Leave Act and noting Third Circuit Court of Appeals decisions having done the same).  Those cases employ the burden-shifting analysis articulated by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). The three-step McDonnell Douglas test has been summarized as follows:

---

[2] In his Complaint, Araujo also alleges that he suffered retaliation for these activities in that NJT kept him out of work without pay from October 6, 2008 until February 20, 2009.  The discipline Araujo was assessed consisted of time held out of service, and thus the Court groups this alleged retaliatory action by NJT under the general discussion of allegedly retaliatory discipline.

> The Court in *McDonnell Douglas* set forth a burden-shifting scheme for discriminatory-treatment cases.  Under *McDonnell Douglas*, a plaintiff must first establish a prima facie case of discrimination. The burden then shifts to the employer to articulate a legitimate, nondiscriminatory reason for its employment action.  If the employer meets this burden, the presumption of intentional discrimination disappears, but the plaintiff can still prove disparate treatment by, for instance, offering evidence demonstrating that the employer's explanation is pretextual.

Raytheon Co. v. Hernandez, 540 U.S. 44, 50 (2003) (citations omitted).  Alternatively, Defendant suggests that the Court look to the regulations governing FRSA retaliation complaints filed with the Department of Labor.  Those regulations also establish a burden-shifting procedure for assessing the merits of a complaint.  In relevant part, they state:

> Notwithstanding a finding that a complainant has made a prima facie showing, as required by this section, an investigation of the complaint will not be conducted or will be discontinued if the respondent, pursuant to the procedures provided in this paragraph, demonstrates by clear and convincing evidence that it would have taken the same adverse action in the absence of the complainant's protected activity.

29 C.F.R. 1982.104(e)(4).  In other words, under the regulation, even if the railroad employee establishes a prima facie case of unlawful FRSA retaliation, the rail carrier employer may defeat the claim if it demonstrates that it would have taken the same action against the employee regardless of the FRSA protected activity.

Whichever analysis applies, the Court finds that Defendants have met their burden under Rule 56 of demonstrating their entitlement to summary judgment on Plaintiff's FRSA claim.  As a matter of law, Plaintiff cannot establish a prima facie case of retaliation because the record lacks evidence from which a reasonable factfinder could infer that the protected activity – Araujo's reports of employee injury – was a contributing factor in NJT's decision to discipline Araujo for the Electrical Operating Rules he violated in the February 25, 2008 incident.  To

prove retaliation under FRSA's whistleblower provision, a plaintiff must establish by a preponderance of the evidence that (1) he engaged in protected activity, (2) the railroad took an adverse employment action after or contemporaneous with the protected activity; and (3) a causal link exists between the protected activity and the adverse action. 49 U.S.C. § 20109(a); see also 29 C.F.R. § 1982.104(e) (listing elements that must be established to prove retaliation under FRSA in administrative proceedings before the Department of Labor); Farrell v. Planters Lifesavers Co., 206 F.3d 271, 279 (3d Cir. 2000) (setting forth elements of retaliation claim for engaging in protected activity under Title VII of the Civil Rights Act of 1964). NJT does not take issue with the first two elements but rather, as the Court previously indicated, moves for summary judgment on the lack of evidence regarding causation. Causation in a retaliation claim is context-specific. Farrell, 206 F.3d at 279. It can be established by showing "temporal proximity" or a pattern of ongoing antagonism sufficient to give rise to an inference of retaliation. Id. at 280–81; Woodson v. Scott Paper Co., 109 F.3d 913, 920-21 (3d Cir.1997)); see also 29 C.F.R. 1982.104(e)(3) (noting that to substantiate a FRSA retaliation complaint to the Department of Labor for investigation, the complainant can demonstrate that protected activity was a contributing factor in the adverse action by showing that adverse action took place shortly after protected activity).

Plaintiff tries to draw a causal connection between the protected activity and adverse action based on the close temporal proximity between the injury reports on February 25 and 26, 2008 and the filing of disciplinary charges against Araujo only days later on March 5, 2008. A causal link may be inferred where the timing of the adverse employment action is "unusually suggestive of retaliatory motive." Krouse v. Am. Sterilizer Co., 126 F.3d 494, 503 (3d Cir.1997);

see also Jalil v. Avdel Corp., 873 F.2d 701, 709 (3d Cir. 1989) (holding that plaintiff established prima facie case of retaliatory discharge where causal connection based on evidence of termination days after employer received notice of plaintiff's EEOC claim).  NJT, however, argues that the timing of NJT's initiation of disciplinary proceedings against Araujo is not by itself enough to constitute evidence of retaliatory motive because NJT was required under its collective bargaining agreement with Araujo's labor union to issue its Notice of Investigation and charge the rule violations within ten days of the February 25, 2008 incident.

The Court agrees.  The facts that gave rise to the charges of rules violations against Araujo are intertwined with the February 25, 2008 fatal injury to Clemente.  To abide by the time limitation imposed by the collective bargaining agreement and preserve its right to pursue discipline, NJT had to notify Araujo of the charges within a very short period of time following Araujo's report of Clemente's injury as well as his next-day report of his own injury.  In light of this constraint, the temporal proximity in this case is not indicative, much less "unusually suggestive" of a causal relationship between the injury reports and the date the charges were filed.

Plaintiff makes an unavailing attempt to create a genuine issue of fact as to NJT's discriminatory motivation based on NJT's decision on the date of the accident not to have Araujo tested for drugs and alcohol. According to Plaintiff's argument, FRA regulations and NJT's own policy require an employee be drug and alcohol tested, among other reasons, for "reasonable cause."  (Goetsch Aff., Ex. 44 at 12.)  As to an employee involved in an FRA-reportable incident, reasonable cause exists if NJT "has a reasonable belief, based on specific facts, that the employee's acts or omissions contributed to the occurrence or severity of the accident or

incident." (Id. at 28.)  Yet, Plaintiff maintains, on February 25, 2008, after interviewing various witnesses, including hours of examining Araujo, Superintendent Meade decided it was not necessary to test Araujo.  In Plaintiff's view, this decision constitutes an admission by Meade that, based on the information available to NJT on February 25, 2008, Araujo did not contribute to the incident.  Plaintiff interprets this "admission" as particularly significant because Meade also testified that the disciplinary charges he filed on March 5, 2008 were based on the information gathered during the February 25, 2008 investigation.  This perceived inconsistency, Plaintiff argues, gives rise to the inference that the safety rule violations charged against Araujo were motivated by his February 26, 2008 self-report of injury (of which Meade was notified on February 27, 2008).

The critical flaw with Plaintiff's argument is his conflation of the protocol for drug and alcohol testing with the internal process by which NJT investigates and enforces safety rule violations.  As NJT argues, the decision not to test an employee for drugs and/or alcohol following a FRSA reportable incident cannot foreclose a rail carrier's right to proceed with appropriate discipline for rules the employee may have violated in connection with that incident.  Drug and alcohol testing, the FRA rules provide, must occur within eight hours of an incident.  Yet, such a narrow time constraint does not apply to NJT's pursuit of disciplinary charges against an employee, which may occur after investigation and consideration of the evidence.  Taken to its logical extreme, Araujo's position would preclude NJT from disciplining any employee through its hearing and investigation procedure if it decided not to subject that employee to a drug and alcohol test in the immediate aftermath of an incident involving employee injury.  This position is not persuasive.

13

Retaliatory motivation for adverse employment action can also be established by demonstrating that other employees committed infractions of comparable seriousness but received differential treatment from the plaintiff. See, e.g., San Filippo v. Bongiovanni, 30 F.3d 424, 444 (3d Cir. 1994) (holding, in context of First Amendment retaliation claim, that plaintiff's evidence of other university faculty members committing similarly serious violations yet receiving no punishment created genuine issue of fact regarding defendant's motivation for discharging plaintiff), abrogated on other grounds by Borough of Duryea, Pa. v. Guarnieri, 131 S.Ct. 2488 (2011). Araujo attempts to create such an issue as to causation by stressing that although the official NJT procedure requires a conductor to confirm that a catenary is de-energized, it was common practice for the catenary outage information to be conveyed from the lineman, who is primarily responsible for electrical equipment safety and catenaries, to the conductor-flagman through a middleman – the contractor's foreman – rather than from lineman to conductor directly. Thus, Araujo implies that other NJT conductor-flagmen routinely violated NJT's Electrical Operating Rules by relying on such relayed information with regard to catenary outages. Yet, Araujo maintains, no other conductor-flagman had, prior to the subject discipline of Araujo, been charged with and punished for violating the Electrical Operating Rules. Araujo, however, has not pointed to a single conductor-flagman, or any other NJT employee, who committed an infraction of the electrical safety rules in connection with an incident involving a fatality yet faced no disciplinary action. In other words, Plaintiff points to no other employee who committed a violation of comparable seriousness. The evidence, if anything, conflicts with his theory of retaliatory animus behind NJT's disciplinary action. The linemen responsible for the catenary, for briefing the conductor on the extent of the outage and for remaining with the

14

contractor crew for their protection were in fact discharged from service, whereas Araujo received a substantially lighter punishment of a few months' suspension, which was considered satisfied by the time he was held out of service following medical clearance to return to work. Thus, the discipline imposed in this case appears to be consistent with the roles of the various NJT employees involved in the accident and proportionate to their level of culpability.

In short, neither the timing of the disciplinary charges, NJT's decision to forego drug and alcohol testing nor Araujo's assertion that he is the only conductor-flagman ever disciplined for a violation of the Electrical Operating Rules raise any issue about the allegedly unlawful motivation of NJT in disciplining Araujo. For the reasons discussed, even when considered together, the evidence proffered by Plaintiff in opposition to the motion fails to establish any causal connection between Araujo's protected activity under FRSA and NJT's adverse employment action. The Court concludes that, on the record presented, no reasonable juror could find that Araujo makes out a prima facie claim for FRSA retaliation.

Assuming, for the purposes of argument, that a prima facie claim could be established, Defendant is nevertheless entitled to summary judgment under a burden-shifting analysis, as described above. As NJT argues, the evidence in the record demonstrates that discipline was legitimately imposed on Araujo as a result of his violation of several electrical safety rules with tragic consequences. NJT has established, by clear and convincing evidence, that the actions of Araujo in connection with the February 25, 2008 incident resulting in Clemente's death warranted the pursuit of a hearing and investigation regarding the violations. The violations were investigated and substantiated following a three-day hearing. Araujo was responsible for the contractor crew's safety. He admitted that he did not know whether the catenary was de-

energized at the Seventh Avenue location of Track 2 yet permitted the contractors under his supervision to work in that area and come within an impermissible clearance of the catenary. The evidence demonstrates an acknowledged rule violation resulting in Clemente's electrocution and death.  Other NJT employees involved in the accident were also disciplined, in fact, more severely than Araujo.  NJT, in sum, has adequately demonstrated that it would have pursued charges and imposed discipline on Araujo regardless of whether he made his FRSA-protected injury reports.

To the extent that Araujo bases his FRSA retaliation claim on his salary suspension in favor of the FELA compensation system, the claim must fail.  Even assuming that this change in payment status constituted an adverse employment action, the record contains no evidence at all from which a reasonable juror could infer a causal link between Araujo's injury reports on February 25 and 26, 2008 and the May 22, 2008 compensation change.  Apart from a lack of temporal proximity, there is no evidence that Plaintiff was subjected to a pattern of ongoing antagonism either before or after the payment switch to the FELA benefits system.  To the contrary, the record demonstrates that NJT has offered a legitimate basis for the adjustment –  its realization that Araujo's need for counseling and leave of absence, though authorized and overseen by the medical department pursuant to the EAP, constituted an on-the-job injury under FELA, as it stemmed from Araujo's role in the February 25, 2008 incident.  NJT has given evidence that a good faith determination was initially made that Araujo's EAP counseling and leave did not constitute an injury in the course of employment but that it was later determined that Araujo's injury should be re-classified as covered by FELA. It has further explained that upon that determination, on or about May 22, 2008, disability benefits under FELA applied.  NJT

16

also notes that Araujo's labor union did not grieve NJT's decision to stop paying Araujo's salary, nor did Araujo file a claim under FELA to recover his unpaid salary for the time period he was out as a result of his on-the-job injury.

In sum, whether the Court looks solely to the statutory language of FRSA to evaluate whether Plaintiff has a viable retaliation claim or applies a burden shifting analysis to the claim, the Court finds that Defendant has met its burden of demonstrating that Plaintiff's FRSA retaliation claim presents no triable issues of fact.  Based on the record before the Court, it concludes that Plaintiff cannot prevail as a matter of law.

**III.   CONCLUSION**

For the foregoing reasons, the Court will grant NJT's motion for summary judgment.  An appropriate form of order will be filed together with this Opinion.

                                      s/ Stanley R. Chesler
                                  STANLEY R. CHESLER
                                  United States District Judge

DATED: March 28, 2012